152 T.C. No. 1

UNITED STATES TAX COURT

RENEE VENTO, ET AL., Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket Nos. 992-06, 993-06,
1168-06.

Filed February 4, 2019.

Following our previous Opinion holding that Ps are not entitled
to foreign tax credits under I.R.C. sec. 901 for certain amounts paid to
the U.S. Virgin Islands, the parties were ordered to submit computa-
tions for entry of decision under Tax Court Rule 155. In their compu-
tations Ps took the position that the amounts at issue were deductible
as State or local taxes under I.R.C. sec. 164(a)(3), an argument they
had not advanced at any prior point in the litigation. Ps moved for
leave to amend their petitions under Tax Court Rule 41(b)(1), setting
forth another new legal argument and asserting that both new issues
had been tried by consent. Ps then filed a motion to reopen the record

[*]This Opinion supplements our previously filed Opinion Vento v.
Commissioner, 147 T.C. 198 (2016). Cases of the following petitioners are
consolidated herewith: Gail C. Vento, docket No. 993-06; and Nicole Mollison,
docket No. 1168-06.

to permit the introduction of new evidence relating to their second new legal theory.

  1. <u>Held</u>: Ps may not raise new issues in a Rule 155 proceeding, and their motion to reopen the record will accordingly be denied.

  2. <u>Held</u>, <u>further</u>, decisions will be entered consistent with R's Rule 155 computations.

<u>Joseph M. Erwin</u>, <u>Marjorie Rawls Roberts</u>, and <u>Erika A. Kellerhals</u>, for petitioners.

<u>John Aletta</u>, <u>Patrick F. Gallagher</u>, and <u>R. Jeffrey Knight</u>, for respondent.

SUPPLEMENTAL OPINION

LAUBER, <u>Judge</u>: On September 7, 2016, the Court filed its Opinion in these cases, <u>Vento v. Commissioner</u>, 147 T.C. 198 (2016), which stated at the end thereof: "Decisions will be entered under Rule 155."[1] In December 2016 the parties filed their respective computations for entry of decision, which were not in agreement. We will enter decisions consistent with the computations submitted by the Internal Revenue Service (IRS or respondent).

---

[1]All statutory references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

Background

These cases involve the 2001 Federal income tax liabilities of petitioners Renee Vento, Gail Vento, and Nicole Mollison. Petitioners are sisters and the daughters of Richard G. and Lana J. Vento. Petitioners and their parents have been frequent visitors to this Court.[2]

Petitioners are, and have always been, citizens of the United States. They lived in the United States throughout 2001, residing in Nevada, Colorado, and Nevada, respectively. Petitioners had considerable U.S.-source income during 2001. None of petitioners received during that year any income sourced in the U.S. Virgin Islands (Virgin Islands).

Petitioners did not file Federal income tax returns for 2001 with the IRS. Rather, in an effort to reduce taxation of their U.S.-source income, they filed territorial income tax returns with the Virgin Islands Bureau of Internal Revenue (VIBIR). They did so purporting to be bona fide residents of the Virgin Islands.

---

[2]See DTDV, LLC v. Commissioner, T.C. Memo. 2018-32; Nicole M. Mollison, docket No. 10265-16; Renee S. Vento, docket No. 10310-16; Lana J. Vento and consolidated cases, docket Nos. 18739-08, 18740-08, 18741-08, 18742-08, 23527-08, 23540-08, 23600-08; Richard G. Vento and consolidated cases, docket Nos. 990-06, 991-06; Richard G. Vento, docket No. 5356-06; Renee Vento, docket No. 5357-06; Lana J. Vento, docket No. 5363-06; Nicole Mollison, docket No. 5364-06; Gail C. Vento, docket No. 5427-06.

Each petitioner has stipulated that she was not in fact a bona fide resident of the Virgin Islands during 2001. Those stipulations are consistent with the conclusion reached by the U.S. District Court for the District of the Virgin Islands and affirmed by the U.S. Court of Appeals for the Third Circuit. VI Derivatives, LLC v. United States, No. 06-12, 2011 WL 703835 (D.V.I. Feb. 18, 2011), aff'd in part, rev'd in part sub nom. Vento v. Dir. of V.I. Bureau of Internal Revenue, 715 F.3d 455 (3d Cir. 2013). The Court of Appeals "readily agree[d] with the District Court that none of the Vento daughters was a bona fide resident" of the Virgin Islands during 2001. Vento, 715 F.3d at 477.

At issue in these cases are two categories of payments received by VIBIR on petitioners' behalf during 2001 and 2002. The first category consists of payments made directly to VIBIR by petitioners or their agents. These payments accompanied petitioners' territorial tax returns filed with VIBIR in October 2002 and their requests for extensions of time to file those returns.

The second category of payments consists of amounts that were "covered into" the Treasury of the Virgin Islands pursuant to section 7654(a). That section generally provides that the net collection of Federal income tax for each taxable year with respect to an individual who is a bona fide resident of a U.S. possession "shall be covered into the Treasury of the specified possession of which such

individual is a bona fide resident." Before filing their territorial income tax returns with VIBIR in October 2002, petitioners had made estimated tax payments to the IRS and had Federal income tax withheld from their wages. After petitioners filed their territorial returns, the IRS "covered into," or transferred to VIBIR, these amounts, as well as certain credits carried forward to 2001 from prior years.

In November 2014 the parties executed stipulations of settled issues that resolved all but one of the issues involved in these cases. Shortly thereafter they filed, and we granted, a motion for leave to submit the cases for decision without trial under Rule 122. In that motion petitioners agreed that the only issue that remained for resolution was "whether petitioners are entitled to a foreign tax credit for any payments made to the U.S. Virgin Islands for 2001." Petitioners agreed that these cases did not "require a trial for the submission of evidence" because the parties had stipulated all evidence needed to resolve that one remaining issue.

In their briefs petitioners contended that both categories of payments at issue--viz., the payments they made directly to VIBIR and the payments VIBIR received from the IRS pursuant to section 7654--constituted "taxes paid to the U.S. Virgin Islands." They contended that they were entitled to foreign tax credits (FTCs) under section 901 for these alleged tax payments.

In our Opinion we rejected petitioners' argument. First, we held that they had failed to show that the amounts in question constituted "taxes paid" under section 901(b)(1). Vento, 147 T.C. at 208-210. Income taxes paid to foreign jurisdictions or U.S. possessions are creditable only to the extent that they are compulsory amounts paid in satisfaction of legal obligations. See sec. 1.901-2(a)(2)(i), (e), Income Tax Regs. Petitioners conceded that they were not bona fide residents of the Virgin Islands in 2001 and that they had no Virgin-Islands-source income for 2001. Because petitioners had no legal obligation to pay Virgin Islands income tax, the amounts paid to VIBIR did not constitute creditable foreign taxes. Vento, 147 T.C. at 208-210.

Second, assuming arguendo that petitioners had paid taxes to the Virgin Islands, we held that the section 904 limitation would bar any credit for 2001. Vento, 147 T.C. at 210. That section generally limits the foreign tax credit to the U.S. tax imposed on the taxpayer's foreign-source income. Sec. 904. Since petitioners had failed to establish that they had any taxable foreign-source income for 2001, their section 904 limitation was zero. Vento, 147 T.C. at 210.

Finally, we explained that the overall statutory scheme demonstrates that "Congress did not intend that Virgin Islands taxes paid by U.S. citizens or residents be creditable under section 901." Id. at 215. This observation "reinforce[d]

our conclusion that petitioners * * * are not entitled to the claimed tax credits."
Ibid.

As directed by the Court, the parties in December 2016 filed computations for entry of decisions under Rule 155. Their computations were not in agreement. Respondent's computations matched almost exactly the deficiencies that petitioners had agreed would be due in the event we rejected their position concerning the claimed FTCs.[3] Petitioners submitted computations showing deficiencies about 60% smaller than those calculated by respondent. These differences reflected petitioners' contention that the amounts paid to VIBIR in 2001 and 2002, which we had held were not "taxes paid" for purposes of section 901, constituted State or local income taxes for which deductions should be allowed under section 164(a). Petitioners had not advanced this alternative contention at any prior point in this litigation.

On February 21, 2017, petitioners filed a motion for leave to amend their petitions. They cited Rule 41(b)(1) as the basis for their motion and expressed their desire "to amend their petitions to allege issues to conform to the evidence,"

---

[3]In their pretrial memorandum petitioners stated that the "amounts in dispute" were deficiencies of $160,523 for Renee Vento, $159,637 for Gail Vento, and $166,983 for Nicole Mollison. The deficiencies that respondent calculated in his computations for entry of decision were $160,523, $159,637, and $166,979, respectively.

urging that the issues they sought to raise were "expressly or implicitly tried by consent." Rule 41(b)(1), captioned "Issues Tried by Consent," provides that, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Upon motion of a party, the Court "may allow such amendment of the pleadings as may be necessary to conform them to the evidence and to raise these issues." Ibid.

In their motion for leave petitioners changed their position once again. In their briefs they had contended that both categories of payments addressed in the Court's Opinion--the payments petitioners made to VIBIR directly and the payments "covered into" VIBIR by the IRS--were payments of Virgin Islands tax eligible for credit under section 901. In their computations for entry of decision they contended that both categories of payments constituted State or local taxes deductible under section 164. In their motion for leave they contended that payments in the first category were deductible under section 164 and that payments in the second category should be credited dollar-for-dollar against their Federal income tax liabilities under section 31(a) (credit for tax withheld from wages) or otherwise. Petitioners had not advanced this latter contention, which they urged "[a]s a protective measure," at any prior point in this litigation.

On April 12, 2017, respondent at our direction responded to petitioners' motion for leave. Respondent denied that either of the new issues petitioners sought to raise had been tried by consent, stating: "Respondent did not expressly or implicitly consent to trial of the new matters raised in petitioners' motion for leave to amend."[4] Respondent further contended that petitioners' motion should be denied in any event because it was futile. Respondent noted that petitioners were cash basis taxpayers and that the payments their agents had made directly to VIBIR were made in 2002. Thus, those payments could not possibly give rise to deductions for 2001, the tax year in issue. And respondent contended that the payments that the IRS had "covered into" VIBIR, once removed from petitioners' 2001 accounts, were "no longer available to offset their 2001 U.S. income tax liabilities."

On February 23, 2018, we denied petitioners' motion for leave to amend, essentially on the ground that their proposed amendments would be futile. With respect to the second category of payments--those "covered into" VIBIR--we noted the existence of (among other things) a jurisdictional question. Because the payments for which petitioners now claimed withholding and related credits had

---

[4]Because these cases were submitted for decision under Rule 122, there was no trial. There is no evidence in the parties' pleadings, briefs, or other document of record to suggest that either party consented, explicitly or implicitly, to our decision of any issue other than the FTC issue.

been made more than three years before the mailing of the notices of deficiency, section 6512(b) arguably deprived us of jurisdiction to determine overpayments. We ordered petitioners to show cause why we should not enter decisions consistent with respondent's computations.

In their response to the order to show cause petitioners urged that we would have jurisdiction to consider their new claims for withholding and related credits. And they challenged respondent's position that these payments, once "covered into" VIBIR, were no longer available to offset their U.S. tax liabilities. Petitioners alleged that "secret agreements" existed between the IRS and VIBIR governing such payments and that these agreements could be "related to the tax law merits of [their] position."

Petitioners filed with their response a motion to reopen the record. They urged that "the record should be reopened to allow petitioners to offer into evidence facts that would refute the position of respondent with respect to crediting taxes." They proposed to "offer evidence that the cover over of taxes from the United States to the Virgin Islands is policy-oriented, not based on the law." Specifically, they asserted that their proposed evidence

> will show that the cover over of tax payments to the Virgin Islands
> does not preclude them from being credited against petitioners'
> United States income tax liabilities. Such evidence will negate re-

spondent's position that "said payments are no longer available to offset * * * [petitioners'] 2001 tax liabilities." * * *  Such evidence would primarily be the several secret Memoranda of Understanding.

## Discussion

In cases such as these, where the parties have made mutual concessions resolving certain issues, the Court normally directs that decisions will be entered under Rule 155.  It provides that, "[w]here the Court has filed * * * its opinion * * * determining the issues in a case, it may withhold entry of its decision for the purpose of permitting the parties to submit computations * * * showing the correct amount to be included in the decision."  Rule 155(a).  Rule 155 computations are designed to ascertain the bottom-line tax effect of the determinations made in the Court's opinion.  See Cloes v. Commissioner, 79 T.C. 933, 935 (1982) ("Rule 155 is the mechanism whereby the Court is enabled to enter a decision for the dollar amounts of deficiencies and/or overpayments resulting from the disposition of the issues involved in a case where those amounts cannot readily be determined.");  Vessio v. Commissioner, T.C. Memo. 1990-565, 60 T.C.M. (CCH) 1150, 1151 ("The exclusive purpose of proceedings under Rule 155 * * * is the computation of the deficiency, liability or overpayment resulting from the findings and conclusions made by the Court."), supplementing T.C. Memo. 1990-218.

If the parties' computations are not in agreement, the Court has discretion to afford them "an opportunity to be heard in argument thereon." Rule 155(b). Rule 155(c), captioned "Limit on Argument," outlines the permissible scope of such argument. It provides that "[a]ny argument under this Rule will be confined strictly to consideration of the correct computation of the amount to be included in the decision resulting from the findings and conclusions made by the Court." Ibid. A party may not use a Rule 155 computation to seek reconsideration of "the issues or matters disposed of by the Court's findings and conclusions."[5] Ibid. And "no argument will be heard upon or consideration given * * * to any new issues." Rule 155(c).

"The Rule 155 computation process is not intended to be one by which a party may * * * raise for the first time issues which had not previously been addressed." Molasky v. Commissioner, 91 T.C. 683, 685 (1988), aff'd on this issue, 897 F.2d 334 (8th Cir. 1990). Rule 155 computations commonly include mathematical adjustments "triggered by the change of taxable income * * * [or] adjusted gross income," e.g., adjustments attributable to "the percentage limit on contributions * * * [or] medical deductions." Home Grp., Inc. v. Commissioner, 91 T.C.

_____

[5]A party seeking reconsideration of any aspect of the Court's opinion must file a motion for reconsideration of findings or opinion under Rule 161.

265, 269 (1988), supplementing City Investing Co. v. Commissioner, T.C. Memo. 1987-36.  A new issue generally will be an issue other than a "purely mathematically generated computational item[]" of this sort.  Ibid.

If a matter "was neither placed in issue by the pleadings, addressed as an issue at trial, nor discussed by this Court in its prior opinion," or if it "would necessitate retrial or reconsideration," that matter may not be raised in the context of a Rule 155 computation.  Molasky, 91 T.C. at 686.  A matter "qualifies as a 'new issue' for purposes of Rule 155 where, to decide the issue, the Court would have to reopen the record and conduct further proceedings to admit additional evidence."  Vest v. Commissioner, T.C. Memo. 1995-188, 69 T.C.M. (CCH) 2491, 2494, supplementing T.C. Memo. 1993-243, aff'd without published opinion, 89 F.3d 839 (7th Cir. 1996).  "Proper judicial administration demands that there be an end to litigation and that bifurcated trials be avoided."  Cloes, 79 T.C. at 937.

A matter may be deemed a "new issue" in the Rule 155 context even if it has computational aspects.  For example, we have treated as "new issues" in a Rule 155 proceeding such questions as entitlement to a net operating loss carry-

back,[6] ability to use income averaging,[7] change to the useful life of a depreciable asset,[8] and application of an accounting treatment.[9] The Court rigorously enforces the bar against raising new issues in a Rule 155 proceeding. See Gladstone v. Commissioner, T.C. Memo. 1992-10, 63 T.C.M. (CCH) 1733, 1734, supplementing T.C. Memo. 1990-173. "Rule 155 is not an 'open sesame' for either party to get adjustments for issues not raised in the deficiency notice, in the pleadings, in the pre-trial memoranda, or at trial." Litzenberg v. Commissioner, T.C. Memo. 1988-482, 56 T.C.M. (CCH) 413, 417.

When submitting these cases for decision without trial under Rule 122, petitioners joined respondent in representing that the only issue remaining for resolution was "whether petitioners are entitled to a foreign tax credit for any payments made to the U.S. Virgin Islands for 2001." That was the only legal issue addressed by the parties in their briefs or by Court in its Opinion. In submitting Rule 155 computations the parties were directed to calculate the tax deficiencies

---

[6]E.g., Vest, 69 T.C.M. (CCH) at 2493; Miller v. Commissioner, T.C. Memo. 1993-588, supplementing T.C. Memo. 1993-49.

[7]E.g., Molasky, 91 T.C. at 686; Cloes, 79 T.C. at 935-936.

[8]E.g., Erhard v. Commissioner, T.C. Memo. 1993-25, supplementing T.C. Memo. 1992-376.

[9]E.g., Paccar, Inc. v. Commissioner, 849 F.2d 393 (9th Cir. 1988), aff'g 85 T.C. 751 (1985).

that flowed from our rejection of petitioners' claimed FTCs, taking into account other concessions each party had made.

Respondent in his computations did exactly that. Petitioners, by contrast, sought to use their Rule 155 computations to raise first one, and then two, legal issues that they had not advanced at any prior point in this litigation. Both of these are "new issues" within the meaning of Rule 155(c).

First, petitioners contended the amounts paid to VIBIR in 2001 and 2002, which our Opinion held did not constitute "taxes paid" for purposes of section 901, nevertheless constituted State or local income taxes deductible under section 164(a)(3). We based our conclusion that these amounts were not "taxes paid" in part on the fact that petitioners had no legal obligation to pay Virgin Islands income tax for 2001. See Vento, 147 T.C. at 208-210. In asserting that they should be allowed deductions for these payments as State or local taxes, petitioners were necessarily asserting that section 164(a)(3) allows deductions for payments that a taxpayer has no legal obligation to make. That is unquestionably a "new issue": Petitioners had not advanced this contention at any prior point in this litigation, and none of the parties addressed it, in any fashion, before the date on which petitioners filed their Rule 155 computations. See Molasky, 91 T.C. at 686.

Second, petitioners contended that the payments the IRS had "covered into" VIBIR should be credited dollar-for-dollar against their Federal income tax liabilities. This position contradicted the position petitioners had taken throughout this litigation, viz., that the amounts "covered into" VIBIR constituted payments of Virgin Islands income tax eligible for foreign tax credits.

Petitioners' new position would require the Court to address at least two subsidiary legal questions, neither of which the parties addressed or even mentioned in their briefs. The first would concern our jurisdiction to determine overpayments on the basis of the withholding and other credits petitioners now seek. See supra pp. 9-10 (citing section 6512(b)). The second question would be whether the payments "covered into" VIBIR, once removed from petitioners' 2001 accounts, remained available to offset their 2001 U.S. income tax liabilities. In urging that petitioners' motion for leave to amend petition was futile, respondent contended that the answer to this second question is "no." In so contending, respondent took a position resembling that which petitioners themselves had taken previously, i.e., that the payments, once "covered into" VIBIR, became payments of Virgin Islands income tax.

Besides requiring that we address novel legal questions, petitioners' current position would require (according to them) that we reopen the record to admit new

evidence concerning (among other things) alleged "secret agreements" between the IRS and VIBIR. This contradicts petitioners' representation, when submitting these cases for decision under Rule 122, that the cases "do[] not require a trial for the submission of evidence." "[T]he established policy of this Court [is] to try all issues raised in a case in one proceeding and to avoid piecemeal and protracted litigation." Markwardt v. Commissioner, 64 T.C. 989, 998 (1975) (disallowing an amendment to the pleadings). Because petitioners' current position would require that we address novel legal questions and (in their view) require that we consider new evidence, it constitutes a "new issue" within the meaning of Rule 155(c). See Molasky, 91 T.C. at 686; Cloes, 79 T.C. at 937.

In Vest we refused to consider a new issue that the taxpayers sought to introduce through Rule 155 computations, denying their motion for leave to amend where they had not raised the issue in their petition, during trial, or in post-trial briefs. 69 T.C.M. (CCH) at 2492-2494. And as Judge Tannenwald had explained 10 years previously, an "appeal to 'the interest of justice' is beside the point" in this setting. Estate of Kurihara v. Commissioner, T.C. Memo. 1985-150, 49 T.C.M. (CCH) 1085, supplementing 82 T.C. 51 (1984). "If we were to accede to the blandishments of that appeal, we would be establishing a pattern of subversion

of the limitations of Rule 155 and its policy of avoiding bifurcated trials." Ibid. (citing Cloes, 79 T.C. at 937).

We will accordingly deny petitioners' motion to reopen the record and enter decisions consistent with the computations respondent has submitted. Petitioners were free, when submitting these cases for decision under Rule 122, to urge alternative positions and alternative legal theories. They did not do so. This may have reflected oversight on their part, or it may have been a strategic choice prompted by fear of undercutting their primary position. For whatever reason, they submitted only the FTC issue for decision, representing that all other issues in the case had been resolved. The FTC issue was thus the only issue that the parties addressed and that we decided. Petitioners cannot get a do-over by raising new issues in their Rule 155 computations.

To implement the foregoing,

Appropriate orders and decisions will be entered for respondent.

Reviewed by the Court.

FOLEY, GALE, THORNTON, PARIS, KERRIGAN, BUCH, NEGA, PUGH, and ASHFORD, JJ., agree with this opinion of the Court.

GUSTAFSON, J., did not participate in the consideration of this opinion.

THORNTON, J., concurring:  I agree with the opinion of the Court and write to make some additional points in support and to respond to some points that Judge Halpern makes in his concurrence.

Rule 155(c) could not be more clear:  "[N]o argument will be heard upon or consideration given * * * to any new issues" during the Rule 155 computations process.  This rule goes back to the earliest days of the Tax Court and its predecessor, the Board of Tax Appeals, which promulgated then Rule 50 (now Rule 155) pursuant to its authority to prescribe procedural rules as granted by the Revenue Act of 1924, ch. 234, 43 Stat. 253.  Since then, this Court has consistently held that a new issue will not be considered during the computations process.  See, e.g., Cloes v. Commissioner, 79 T.C. 933 (1982); Estate of Stein v. Commissioner, 40 T.C. 275, 280 (1963); John Gerber Co. v. Commissioner, 44 B.T.A. 26, 31 (1941); Great N. Ry. Co. v. Commissioner, 10 B.T.A. 1347, 1356 (1928), supplementing 8 B.T.A. 225 (1927).

Judge Halpern is correct that Rule 155 should be read "in tandem" with Rule 41 (and, I would add, with all the other Rules).  But the result of reading the Rules together is not, as Judge Halpern suggests, to vitiate the Rule 155(c) bar against considering new issues in the computations process, but rather to subject Rule 41 motions to amend pleadings to a qualification:  Any such motion, whether

under Rule 41(a) or (b), must be made in accordance with Rule 155(c) (as well as with the other rules). See Helvering v. Edison Sec. Corp., 78 F.2d 85, 91 (4th Cir. 1935) (addressing the operation of then Rule 50), aff'g in part and remanding 29 B.T.A. 483 (1933).

As the opinion of the Court explains, principles of proper judicial administration weigh against reconsidering petitioners' motion for leave to amend their petitions or their motion to reopen the record in the Rule 155 proceeding. As is clear from petitioners' motion to reopen the record, they contemplate that our consideration of their new issue would entail reopening the record to take additional evidence. Moreover, petitioners have failed to show diligence to raise their requested new issue in a timely manner. They are seeking to raise a new issue that became significant only after the Court decided against them the substantive issue as to their eligibility for the foreign tax credit under section 901. Except for a lack of diligence, there is no reason they could not have timely raised their new issue by pleading it in the alternative, as permitted under Rule 31(a), or by addressing it in the Rule 122 motion and/or on brief. Petitioners claim that it is respondent who has raised the new issue by not including the requested credit in his computations. But as Judge Tannenwald stated in a somewhat analogous situation: "[W]e see no reason to impose on respondent, after winning the case, an

obligation to construct a lesser deficiency on a basis other than that represented to the Court as the sole issue for decision." Cent. Pa. Sav. Ass'n & Subs. v. Commissioner, T.C. Memo. 1996-172, slip op. at 5, supplementing 104 T.C. 384 (1995). For all these reasons, the opinion of the Court properly declines to consider petitioners' new issue.

Judge Halpern's concurrence posits an alternative basis for denying petitioners' motion for leave to file an amended petition: He believes that their requested amendment would be futile because they cannot prevail on the substantive merits. Although the futility of a requested amendment might be a sufficient reason to decline to consider a new issue in a Rule 155 proceeding, it is not a necessary condition for doing so. Indeed, if the decision whether to permit a new issue to be raised in a Rule 155 proceeding hinged on the merits of the new issue, this would lead to the illogical result that it would be necessary to consider the new issue in order to determine whether or not to consider it, contrary to the plain terms of Rule 155(c).

In any event there are sound reasons against our undertaking to decide the substantive merits of petitioners' new issue in this Rule 155 proceeding. The issues presented are complex and unsettled in the law. There has been no meaningful briefing of these issues. And any adequately informed resolution

would require additional legal and factual development. For instance, Judge Halpern's substantive analysis presumes that petitioners never requested or received extensions of time for filing their 2001 U.S. income tax returns. But the record presently before us provides no indication of whether they did or did not.

These various considerations make it unnecessary, indeed unwise, to address the substantive merits of petitioners' new issue. Nevertheless, in the light of the extended substantive analysis presented in Judge Halpern's concurrence and out of concern that this substantive analysis, left unchallenged, might be thought to have implications beyond these cases, I briefly set out below some key concerns with his analysis.

As a preliminary matter, Judge Halpern's analysis proceeds from an unduly narrow view of petitioners' requested amendment, treating it strictly as a claim for an overpayment, over which he concludes we lack jurisdiction. Petitioners themselves have not expressly framed their new issue as an overpayment claim; they have merely requested "credit" for taxes paid to the IRS. If, as Judge Halpern believes, the limitations period has expired for any overpayment claim, this circumstance would not necessarily rule out a claim for equitable recoupment, especially if the U.S. Treasury had no basis for covering petitioners' tax payments over to the U.S. Virgin Islands (Virgin Islands). See sec. 6214(b); Menard, Inc. v.

Commissioner, 130 T.C. 54 (2008), supplementing T.C. Memo. 2004-207 and T.C. Memo. 2005-3.  Indeed, petitioners' motion to reopen the record, seeking to introduce evidence of the alleged impropriety of the IRS' covering their tax payments over to the Virgin Islands, seems directed squarely to such a claim in equity.

More fundamentally, Judge Halpern's analysis as relates to a presumed overpayment claim improperly conflates the requirements for making a valid return with the requirements for filing a return.  The question addressed in Judge Halpern's concurrence is generally which look-back period applies under sections 6512(b)(3) and 6511(b)(2).  Which look-back period applies depends on whether a return was filed.  Judge Halpern would conclude that the documents filed with Virgin Islands Bureau of Internal Revenue (VIBIR) do not qualify as returns for U.S. tax purposes, apparently on the basis of his conclusion that the returns were not properly filed.  But whether the returns were properly filed is a separate question from whether the documents were returns in the first instance.

In general, the requirements for a document to constitute a valid return are: (1) the document must contain sufficient data to calculate tax liability, (2) the document must purport to be a return, (3) there must be an honest and reasonable attempt to satisfy the requirements of the tax law, and (4) the taxpayer must have

executed the document under penalties of perjury. See Beard v. Commissioner, 82 T.C. 766, 777 (1984), aff'd per curiam, 793 F.2d 139 (6th Cir. 1986). If these requirements are met, then the document is a return. By contrast, whether a return has been filed (an issue that brings into play, for instance, provisions of sections 6501(a) and 6511(b) that require a return filing) depends on what instructions the IRS has given for filing.

In Hulett v. Commissioner, 150 T.C. ___ (Jan. 29, 2018), the opinion of the Court and the concurrence agreed that the documents filed with VIBIR were sufficient to qualify as returns for Federal tax purposes. The point of difference between those two opinions was when the returns should be treated as sufficiently "filed".[1] Judge Halpern's concurrence in the cases at bar, on the other hand, seems to reason that the documents petitioners filed with VIBIR cannot be returns because they were not filed in the right place. This conclusion seems to be based on some sort of new informational test, i.e., on the basis of whether the IRS would have been informed by the way in which the taxpayer filed. But the requirement

---

[1]The concurrence would have held that the returns were filed when they were filed with VIBIR. The opinion of the Court held that they were filed only when received by the IRS. The dissent focused on the filing as well, arguing that the opinion of the Court was incorrect because the copies of the returns that were sent to the IRS had not been filed "by the taxpayer". Arguably, then, Judge Halpern's concurrence in the cases at bar is inconsistent with all three opinions in Hulett v. Commissioner, 150 T.C. ___ (Jan. 29, 2018).

that the document contain sufficient data is part of the <u>Beard</u> test for a valid return; it is not part of the filing requirement. The filing requirement is not premised on whether the IRS is informed; i.e., it is not a question of what the IRS received and understood. Instead, a filing issue is generally a question of whether the taxpayer's mode of filing complied with the IRS' instructions (and in these cases there were no instructions for the periods in question).

For example, a properly filed return starts the period of limitations even if the IRS does not receive the return in the mail (i.e., so long as the taxpayer uses an appropriate mailing method and can prove it). Although such a return does not inform the IRS, the statute of limitations begins to run because what was mailed was a return and was properly filed. Whether the return was <u>filed</u> is not a question of what the IRS knew; it is a question of whether the taxpayer complied with the instructions for filing.

In <u>Appleton v. Commissioner</u>, 140 T.C. 273 (2013), this Court concluded that the returns that were filed with VIBIR were properly filed even though those returns could not possibly have sufficiently informed the IRS under Judge Halpern's test (in <u>Appleton</u>, as in these cases, returns were not sent directly to the IRS). Judge Halpern contends that <u>Appleton</u> is distinguishable because the instructions at the time directed that bona fide Virgin Islands residents file their

U.S. tax returns with VIBIR, and the taxpayers in <u>Appleton</u> were in fact bona fide Virgin Islands residents. But if the instructions available at the time provide a basis for distinguishing <u>Appleton</u>, this distinction would seem to cut in petitioners' favor: There were no instructions in 2001 for taxpayers who were uncertain about their residency status.

Judge Halpern's concurrence would treat a mistaken filing status as a failure to file. The concurrence in <u>Hulett</u> looked to well-established caselaw for the proposition that a taxpayer's error regarding her <u>status</u> falls within the protection of the statute of limitations. <u>See</u> <u>Germantown Tr. Co. v. Commissioner</u>, 309 U.S. 304 (1940); <u>Mabel Elevator v. Commissioner</u>, 2 B.T.A. 517, 519 (1925); <u>New Capital Fire, Inc. v. Commissioner</u>, T.C. Memo. 2017-177.

Ultimately, the question is whether a section 932(c)(2) return is sufficient to start the section 6501(a) period of limitations. Judge Halpern's concurrence suggests that a section 932(c)(2) return is insufficient unless it was filed in the "right place". <u>See</u> Halpern op. p. 61. But under section 932(c)(2) the "right place" for filing a section 932(c)(2) return is "with the Virgin Islands".

Taken to its logical conclusion, Judge Halpern's analysis would suggest that even bona fide Virgin Islands residents who filed correct returns would never be free from the threat of possible IRS challenges with respect to their residency

status.  This unsettling possibility calls to mind the words of the Supreme Court in

Rothensies v. Elec. Storage Battery Co., 329 U.S. 296, 273 (1946):

> It probably would be all but intolerable * * * to have an income tax
> system under which there never would come a day of final settlement
> and which required both the taxpayer and the Government to stand
> ready forever and a day to produce vouchers, prove events, establish
> values and recall details of all that goes into an income tax contest.
> Hence a statute of limitation is an almost indispensable element of
> fairness as well as of practical administration of an income tax policy.

Finally, Judge Halpern's concurrence harbors an internal inconsistency.

The substantive issue raised by petitioners' requested amendment is relatively

straightforward--whether amounts they paid to the IRS for their 2001 income tax

liabilities reduce their 2001 U.S. income tax liabilities.  The IRS no longer has

those amounts because it paid them over to the Virgin Islands pursuant to section

7654, which expressly conditions payment from the U.S. Treasury to the Virgin

Islands Treasury on the application of section 932(c) and on the bona fide

residency of the taxpayer in the Virgin Islands.

Judge Halpern's concurrence indicates that these amounts were paid to the

Virgin Islands on the basis of the returns petitioners filed with VIBIR.  The

underlying premise seems to be that the returns petitioners filed with VIBIR did

adequately disclose their residency position to the U.S. Treasury and the IRS for

the purpose of section 7654 (which uses the section 932(c) definition of bona fide

residency).  But the concurrence also concludes that the returns petitioners filed with VIBIR <u>did not</u> disclose their residency position to the U.S. Treasury and the IRS for the purpose of section 932(c) itself.  These are completely inconsistent positions.  If application of section 6501 depends on whether the taxpayer was in fact a bona fide resident, rather than on whether he or she filed as such, then section 7654 should be interpreted in exactly the same way, i.e., as requiring <u>actual</u> residency rather than just a VIBIR return reporting residency.

At the end of the day, the opinion of the Court wisely and properly declines to take the bait to consider these complex and unsettled issues, untimely raised in the Rule 155 computations process.

KERRIGAN, LAUBER, NEGA, PUGH, and ASHFORD, <u>JJ</u>., agree with this concurring opinion.

HALPERN, J., concurring in the result only:  Petitioners have reason to feel like Charlie Brown after Lucy first holds a football for him to kick and then pulls it away, leaving poor Charlie sprawled flat on his back.  When petitioners submitted Rule 155 computations that treated the amounts in issue as deductible under section 164, I reminded them that they could not raise new issues during Rule 155 proceedings.  (I was the Judge assigned to petitioners' cases when submitted and remained so up to the issuance of today's Opinion.)  I then advised petitioners that the proper way of raising the issue of the deductibility of the amounts paid to the Virgin Islands would be to move for leave to amend their petitions.  On the basis of that suggestion, they duly filed a motion to amend their petitions, which sought to raise not only the deductibility of the amounts they paid to the Virgin Islands but also their ability to apply the amounts "covered over" to the Virgin Islands to offset their 2001 Federal income tax liabilities.  I denied their motion because I determined that their proposed amendments would be futile.  In regard to their claimed credit of the covered-over amounts, I based that determination on my understanding that, in a telephone conference I had held with the parties' counsel, petitioners' counsel had conceded that the Court did not have jurisdiction to consider that claim.  In the same order in which I denied petitioners' motion for leave to amend their petitions, I ordered them to show cause why I

should not enter decisions in accordance with respondent's Rule 155 computations. In response to my show cause order--which remains unresolved-- petitioners disavowed the concession I had understood them to have made. They argue that, under Hulett v. Commissioner, 150 T.C. __ (Jan. 29, 2018), we have jurisdiction to determine and order refunds of the overpayments that would result from giving them credit for the covered-over amounts. Now the Court professes its intention to enter decisions in accordance with respondent's Rule 155 computations without addressing the question of its jurisdiction to consider petitioners' overpayment claims. The majority seems to say that petitioners were never entitled to raise any new issues at the Rule 155 stage, implying that my invitation of a motion to amend their petitions was unwarranted. The majority now tells petitioners (and me) that I ought never have held out the football.

That said, I do not disagree with the majority's announced intentions regarding the disposition of petitioners' cases. I agree that petitioners are not entitled to raise the question of their ability to apply the covered-over amounts against their 2001 Federal income tax liabilities. And petitioners have conceded that, as cash method taxpayers, they are not entitled to deductions under section 164 in computing those liabilities. Therefore, it follows that petitioners' motion to reopen the record should be denied, my show cause order should be made

absolute, and decisions should be entered in accordance with respondent's Rule 155 computations.

The analytical path to that result, however, is longer and more involved than the majority lets on. My colleagues tie themselves in knots to avoid the jurisdictional and substantive issues petitioners' motion raises. Their contortions produce an analysis that is unclear at best, untenable at worst. Petitioners are entitled to a better explanation for the disposition of their cases than the majority offers them. I write separately in an effort to provide them with that explanation.

As far as I can tell, the majority's resolve to enter decisions consistent with respondent's Rule 155 computations, which would presumably involve making absolute my show cause order of February 23, 2018, rests on the conclusion that petitioners' claim that they are entitled to apply the amounts covered over to the Virgin Islands to offset their 2001 Federal income tax liabilities is "a 'new issue' within the meaning of Rule 155(c)." See op. Ct. p. 17. Thus, the majority appears to announce a new dictum: "Thou shalt not, ever, under any circumstances, raise a new issue during a Rule 155 proceeding." That dictum, however, is untenable: It contravenes the plain text of the relevant provisions of our Rules and cannot be reconciled with our prior caselaw--including that on which the majority purports to rely.

The plain text of the relevant Rules demonstrates that Rule 155(c)'s prohibition on raising new issues is not absolute. Rule 155(c) undeniably limits the scope of what can be considered during a Rule 155 proceeding. It provides: "Any argument under this Rule will be confined strictly to consideration of the correct computation of the amount to be included in the decision resulting from the findings and conclusions made by the Court, and no argument will be heard upon or consideration given to the issues or matters disposed of by the Court's findings and conclusions or to any new issues." And issues not raised in the parties' pleadings or tried by the parties' consent are "new issues" subject to Rule 155(c)'s prohibition. See Molasky v. Commissioner, 91 T.C. 683, 686 (1988), aff'd, 897 F.2d 334 (8th Cir. 1990). But that prohibition must be read in tandem with Rule 41(a) and (d).

Rule 41(a) provides in pertinent part:

A party may amend a pleading once as a matter of course at any time before a responsive pleading is served. If the pleading is one to which no responsive pleading is permitted and the case has not been placed on a trial calendar, then a party may so amend it at any time within 30 days after it is served. Otherwise a party may amend a pleading only by leave of Court or by written consent of the adverse party, and leave shall be given freely when justice so requires.

And Rule 41(d) provides: "When an amendment of a pleading is permitted, it shall relate back to the time of filing of that pleading, unless the Court shall order

otherwise either on motion of a party or on its own initiative." Thus, if the Court grants a taxpayer's motion for leave to amend her petition under Rule 41(a), the issues raised in the amended petition are generally treated as having been included in the taxpayer's initial petition. Those issues would thus be treated as having been part of the case from the outset. After giving effect to Rule 41(d)'s relation-back principle, those issues would not be "new" issues raised for the first time during Rule 155 proceedings, and Rule 155(c) would not bar consideration of them.

Our prior caselaw, including that on which the majority purports to rely, confirms the interplay of Rules 155 and 41 described above. For example, Cloes v. Commissioner, 79 T.C. 933 (1982), which the majority cites repeatedly, involved taxpayers who raised for the first time during Rule 155 proceedings their claimed entitlement to income averaging. The Court rejected that claim and entered its decision adopting the Commissioner's computation. Six days later, the Court received a motion from the taxpayers seeking to amend their petition to raise the income averaging issue. If Rule 155(c) erects an absolute bar against raising new issues that cannot be overcome by seeking leave to amend pleadings, as the majority in the present cases now suggests, the Court in Cloes would have simply dismissed the taxpayers' motion as untimely without giving it further

consideration. But that is not what the Court did. Instead, it vacated its prior decision and directed that a hearing be held to consider the taxpayers' motion.

In an Opinion denying the taxpayers' motion, then Chief Judge Tannenwald wrote:

> The plain, hard fact is that if we were to grant petitioners' motions, we would of necessity have to reopen the record and afford petitioners a further trial. The petitioners would have to prove, and respondent would be free to contest, any and all items of income and deduction for the base period years. We see no requirement of justice that compels a favorable decision on petitioners' motions under such circumstances. Indeed, a further trial is exactly what is not permitted under Rule 155. Even if we were to treat petitioners' motions as constituting a request to the Court to reopen the record, we would reject the request. Proper judicial administration demands that there be an end to litigation and that bifurcated trials be avoided. * * *

Cloes v. Commissioner, 79 T.C. at 937. Thus, although Judge Tannenwald denied the taxpayers' motion to amend their petition, his reason for doing so was not simply that the taxpayers filed their motion too late--even though they filed their motion only after the close of Rule 155 proceedings and the Court's entry of an initial decision. Instead, alluding to Rule 41(a)'s mandate that motions for leave to amend pleadings be freely granted "when justice so requires", Judge Tannenwald determined that justice did not require granting the taxpayers' motion under the circumstances before him. He based that determination on the reality that allowing the taxpayers to raise the income averaging issue would have

required a further trial to admit substantial additional evidence. By contrast, as I explain below, consideration of petitioners' overpayment claims in the cases now before us does not require the admission of substantial (or even any) additional evidence.[1]

Given how Judge Tannenwald proceeded in <u>Cloes</u>, it should come as no surprise that the majority has pulled out of context his statement, made just three years later, that appeals to the interest of justice by a taxpayer seeking to raise a new issue during Rule 155 proceedings were "beside the point". <u>See</u> <u>Estate of Kurihara v. Commissioner</u>, T.C. Memo. 1985-150, T.C.M. (P-H) para. 85,150, at 640-85 (1985). <u>Estate of Kurihara</u> was similar to <u>Cloes</u> in that it involved a taxpayer's effort to raise during Rule 155 proceedings issues whose resolution would have required, in effect, a new trial. As Judge Tannenwald explained:

> The long and short of the matter is that * * * petitioner is merely seeking to raise issues that became significant only after the [sole] substantive issue * * * [identified by the parties in submitting the case] was decided against it. In this context, petitioner is in no

---

[1]Both the majority and Judge Thornton's concurring opinion scrupulously avoid any determination of the need for new evidence to consider petitioners' overpayment claims. The majority notes repeatedly that considering those claims would require new evidence "according to * * * [petitioners]" or "in their view". <u>See</u> op. Ct. pp. 16-17. Judge Thornton observes that petitioners "contemplate that our consideration of their new issue would entail reopening the record to take additional evidence." <u>See</u> Thornton op. p. 20. The majority and Judge Thornton's concurrence never assess the need for new evidence.

> different a position from that of the taxpayers in <u>Cloes v.
> Commissioner</u> * * *.  If petitioner wanted the Court to consider these
> items, it should have pleaded the issues which they raise and dealt
> with them by way of the stipulation of facts, and/or an evidentiary
> trial, and on brief.  It is too late in the game for petitioner to do so
> now.  Petitioner's appeal to "the interest of justice" is beside the
> point.  If we were to accede to the blandishments of that appeal, we
> would be establishing a pattern of subversion of the limitations of
> Rule 155 and its policy of avoiding bifurcated trials.  <u>See Cloes v.
> Commissioner</u>, * * * [79 T.C.] at 937.

<u>Id.</u> at 85-639 to 640-85.  Judge Tannenwald thus denied the taxpayer's motion to

amend or supplement its petition.  But given the plain terms of Rule 41(a) and

what Judge Tannenwald himself said and did in <u>Cloes</u>, his dismissal of appeals to

the interest of justice cannot be read to mean that consideration of what justice

requires is never appropriate in ruling on a motion filed by a taxpayer during or

after Rule 155 proceedings to amend the taxpayer's petition.  Judge Tannenwald's

references to <u>Cloes</u> indicate that he denied the taxpayer's motion in <u>Estate of</u>

<u>Kurihara</u> for the same reasons he denied the motion at issue in the earlier case--

because consideration of the new issues the taxpayer sought to raise would have

required further proceedings to receive substantial additional evidence.[2]

---

[2]With all due respect to Judge Tannenwald, the quote the majority pulls out
of context from <u>Estate of Kurihara v. Commissioner</u>, T.C. Memo. 1985-150, may
be a rare example of imprecision on his part.  Most likely he meant not that the
taxpayer's appeal to "the interest of justice" was beside the point--in the sense that
it was irrelevant--but rather that, under the circumstances, its appeal was

(continued...)

The majority's quotation, see op. Ct. p. 13, from Vest v. Commissioner, T.C. Memo. 1995-188, 1995 WL 238691, at *4, supplementing T.C. Memo. 1993-243, aff'd without published opinion, 89 F.3d 839 (7th Cir. 1996), demonstrates that the need for "further proceedings to admit additional evidence" was important in that case as well. In Vest, the taxpayers sought to amend their petition after the Court's request for Rule 155 computations to claim a net operating loss carryback from a year after the years at issue in the case. The Commissioner objected to the taxpayers' motion "on the grounds that Rule 155(c) prohibits the introduction of new issues." Id. at *3.

We accepted in Vest v. Commissioner, 1995 WL 238691, at *3, that as a "general rule * * * new issues may not be raised in a Rule 155 proceeding." We referred to prior cases holding "that an NOL carryback claim is a new issue which cannot be raised for the first time in a Rule 155 proceeding." Id. "The reason", we explained, "is that, ordinarily, the record would have to be reopened in order to permit the taxpayer to introduce evidence establishing his entitlement to the carryback and its amount, and to give the Commissioner an opportunity to contest the taxpayer's eligibility for the carryback." Id. We elaborated:

---

[2](...continued)
unavailing.

> If we were to grant petitioners' motion to raise this issue, we would be compelled to reopen the record and afford petitioners a second trial, in which the validity of every item of income, deduction, and credit reported on petitioners' * * * joint income tax return [for the loss year] would be at issue. The ensuing proceedings could easily rival the length and complexity of those already completed by the parties. * * *

Id. Citing <u>Cloes</u>, we concluded: "Such a continuation of this case would contravene the principles of judicial economy that underlie Rule 155." <u>Id.</u>

If Rule 155(c) established an absolute bar against raising new issues during Rule 155 proceedings, our analysis in <u>Vest</u> could have stopped there. But it did not. We recognized that the Rule 155(c) bar applied only in the absence of an amendment to the taxpayers' petition. We thus considered the taxpayers' Rule 41(a) motion and concluded that "justice does not require that petitioners be given leave to amend their pleadings to raise the [net operating loss] issue." <u>Vest v. Commissioner</u>, 1995 WL 238691, at *4. We considered "as a form of prejudice to respondent * * * the fact that a new trial would be required and that respondent would be forced to incur the delays and costs of an additional proceeding." <u>Id.</u> at *5.

In short, the very authorities on which the majority relies establish that Rule 155(c) does not impose an absolute bar on raising new issues at (or even after) the Rule 155 stage of a case. A taxpayer can raise issues not previously considered by

moving for leave to amend her petition. And that leave must be granted when justice requires.[3]

The majority makes no effort to determine whether justice requires granting petitioners' motion for leave to amend their petitions. Perhaps the majority views that motion as having been filed only under Rule 41(b)(1), to formally amend the pleadings to add issues tried by the parties' consent. If the majority's analysis rests on viewing petitioners' request as that limited, however, it never says so. In the background section of its opinion, the majority describes petitioners' invocation of Rule 41(b)(1) and respondent's denial that the issues petitioners sought to raise had been tried by the parties' consent. But in the analysis presented in the discussion section of its opinion, the majority does not explicitly conclude that respondent was correct that the issues had not been tried by the parties' consent,[4] nor does it identify Rule 41(b)(1) as the sole basis for

---

[3]Molasky v. Commissioner, 91 T.C. 683 (1988), aff'd, 897 F.2d 334 (8th Cir. 1990), Litzenberg v. Commissioner, T.C. Memo. 1988-482, and Gladstone v. Commissioner, T.C. Memo. 1992-10, supplementing T.C. Memo. 1990-173, did not involve motions for leave to amend petitions. In each of those cases, however, any such motion could have been justifiably denied because consideration of the issue the taxpayer sought to raise would have required substantial additional evidence.

[4]The majority's description of petitioners' overpayment claims as involving a "new issue" suggests that it agrees with respondent that that issue was not tried

(continued...)

petitioners' motion. It follows that the majority views as irrelevant whether petitioners sought to rely on Rule 41(a) as well as Rule 41(b)(1) in seeking to amend their petitions. In either event, petitioners would apparently run into the majority's "no new issue during Rule 155 proceedings" dictum.

Moreover, treating petitioners' motion to amend as resting only on Rule 41(b)(1) would read it more narrowly than either I or respondent had read it in the proceedings to date. I have already noted that petitioners moved to amend their petitions at my invitation. I made that invitation after advising petitioners that, without amendment of their petitions, their claim that they were entitled to deduct under section 164 the amounts paid to the Virgin Islands would be a new issue that they could not raise under Rule 155. Thus, when I advised petitioners of my willingness to entertain a motion to amend, I had in mind one filed under Rule 41(a) rather than Rule 41(b)(1). If I had viewed the issue petitioners sought to raise as having been tried by the parties' consent, I would not have brought up the prospect of amending their petitions. Rule 41(b)(1) allows amendment in those cases, but consideration of the issue in question does not depend on amendment of

---

[4](...continued)
with the parties' consent. Otherwise, the issue would have been "treated in all respects as if * * * [it] had been raised in the pleadings", Rule 41(b)(1), and thus would not have been appropriately characterized as a new issue.

the pleadings. Whether or not amended, the pleadings would have been treated as having raised the issue tried by consent. Actually amending the pleadings would have been an unnecessary formality.

When petitioners responded to my invitation by filing their motion to amend, they did not make it as clear as they might have that they were relying, at least in part, on paragraph (a) of Rule 41. They styled their motion as one "For Leave to Amend Petition". The recognition that amendment requires leave of the Court implicates paragraph (a). A party does not need "leave" to amend a pleading under paragraph (b)(1) to add an issue tried by consent. On the other hand, immediately beneath its caption, petitioners' motion states: "Petitioners move pursuant to Tax Court Rule 41 to amend their petitions to allege issues to conform to the evidence stipulated by the parties." Describing the amendment they sought to make as "alleg[ing] issues to conform to the evidence" implicates paragraph (b)(1) of Rule 41. Later, petitioners quote paragraph (b)(1) and argue: "The inclusion of stipulations on the issues sought to be added to the petition satisfies the standard of Tax Ct. R. 41(b)(1) that they were 'tried by express or implied consent of the parties.'"

It thus appears that petitioners sought to bolster their case for amending their petitions by trying to shoehorn themselves into Rule 41(b)(1) without

realizing that, if the issues they sought to raise had been tried by the parties' consent, they would not have been new issues for purposes of Rule 155, and I would have had no reason to invite a motion to amend. But petitioners never say explicitly that they sought to rely only on paragraph (b)(1) of Rule 41. And, in addition to styling their motion as being "for leave to amend", they also claimed that "Respondent would not be prejudiced" by the amendments they sought to make. Absence of prejudice is not a condition to allow a party to amend her petition under paragraph (b)(1). As I explain further below, however, absence of prejudice is a factor in determining whether justice requires granting leave to amend under paragraph (a). See, e.g., Estate of Lee v. Commissioner, T.C. Memo. 2009-303, 2009 WL 4981328, at *3 (listing among relevant factors in evaluating a motion for leave to amend under Rule 41(a) "whether the opposing party would suffer unfair surprise, disadvantage, or prejudice").

The opposition respondent filed in response to petitioners' motion demonstrates that he read it as requesting leave to amend under Rule 41(a). Respondent begins his argument by quoting Rule 41(a)'s mandate to grant leave to amend a pleading "when justice so requires", while noting that "leave to amend a pleading may be inappropriate where the amendment is futile." See Estate of Lee v. Commissioner, 2009 WL 4981328, at *3 ("[A] court should deny a party's

request to amend a pleading where the party cannot prevail on the merits of the requested amendment."). The remainder of respondent's argument elaborates on his claim that the proposed amendments would be futile because, in respondent's view, the arguments petitioners would advance in respect of the issues they sought to raise lack substantive merit. Respondent makes no argument that granting petitioners' motion would have caused him to "suffer unfair surprise, disadvantage, or prejudice." See id.

If petitioners' motion was based solely on Rule 41(b)(1), the vast bulk of respondent's response to the motion would have been irrelevant. In his opposition, respondent does not explicitly mention paragraph (b)(1) at all, and he alludes to it only briefly, when he denies at the outset that the amendments petitioners sought would "conform to the evidence presented" and then disclaims having consented to trial of the issues petitioners sought to raise. See op. Ct. p. 9. If respondent had interpreted petitioners' motion as having been filed only under Rule 41(b)(1), he would have had no need to say anything further. His extensive discussion of the alleged futility of petitioners' motion shows that he read it as including a request for leave to amend under paragraph (a) of Rule 41.

Influenced by my own understanding of the motion I had invited, and reinforced by respondent's interpretation of the motion petitioners filed in

response, I read petitioners' motion the same way respondent did.  I held a second teleconference with the parties on February 22, 2018, to discuss the motion.  The discussion on that call focused on whether the amendments petitioners sought would be futile, premised on the understanding that petitioners were seeking leave to amend under paragraph (a) of Rule 41.  The question of whether the issues they sought to raise in their proposed amendments had been tried by the consent of the parties never came up.  Thus, that discussion should be viewed as having resolved any ambiguity in the grounds for petitioners' motion (and perhaps as having effected an amendment to that motion, to the extent necessary, to include a request for leave to amend under paragraph (a)[5]).

Consistent with the treatment of petitioners' motion in the February 22, 2018, conference call, my order the following day denying that motion treated it as having been made under Rule 41(a).  I denied the motion on the grounds that, as respondent had alleged in his opposition, the amendments sought would be futile.  That order reflected my apparently mistaken understanding that petitioners had conceded that the Court lacked jurisdiction to consider any overpayments that

---

[5]Petitioners might have justifiably relied on my discussion of their motion with the parties' counsel to forbear making additional submissions to clarify that they were seeking leave to amend their petitions under Rule 41(a).

would have resulted if the amounts covered over to the Virgin Islands had remained available to credit against their 2001 Federal income tax liabilities.

Petitioners' response to my show cause order, disavowing the concession on which I based my initial denial of their motion for leave to amend their petitions, requires reconsideration of that denial. Given the procedural history rehearsed above, it would be inappropriate to uphold the denial of their motion on the grounds that it rested only on Rule 41(b)(1) and sought to raise new issues not tried by the parties' consent. If that is what the majority is doing, it is ignoring the ambiguity in petitioners' motion and the extent to which that ambiguity was resolved by the prior proceedings concerning the motion. If instead the majority is upholding my prior denial of the motion without regard to whether it included a request for leave to amend under Rule 41(a) on the grounds that Rule 155(c) erects an absolute bar to raising new issues during Rule 155 proceedings, the majority is ignoring the plain terms of the relevant Rules and the way we have interpreted and applied them in our prior caselaw. For those reasons, I judge the majority's explanation for its intended disposition of petitioners' cases inadequate.

Judge Thornton's concurring opinion also fails to provide petitioners with an adequate explanation for the Court's adherence to my denial of their motion for leave to amend their petitions. Judge Thornton accepts that Rule 155(c)'s

prohibition on raising new issues during Rule 155 proceedings must be read in tandem with Rule 41. But Judge Thornton would not view Rule 41 as qualifying Rule 155(c). Instead, he views Rule 155(c) as qualifying Rule 41. Motions to amend pleadings under Rule 41, he posits, "must be made in accordance with Rule 155(c)". See Thornton op. p. 20. I confess I am at a loss to know what that means. Rule 155(c) says nothing about the process of seeking to amend pleadings. Thus, if there is any daylight between Judge Thornton's qualification for Rule 41(a) motions during Rule 155 proceedings and the majority's apparent reading of Rule 155(c) as an absolute bar to raising new issues, I do not see it.

Perhaps Judge Thornton means that, when a party seeks to raise a new issue during Rule 155 proceedings, giving heed to Rule 155(c) means that the party's delay in raising the issue should weigh strongly against allowing the party to amend her pleadings. To the extent that Judge Thornton can be read to consider whether justice requires allowing petitioners to amend their petitions, he seems to rely on two factors in answering that question in the negative. First he observes that "petitioners have failed to show diligence to raise their requested new issue in a timely manner." See Thornton op. p. 20. And second, he observes that the issues raised by petitioners' motion "are complex and unsettled in the law." See id. p. 21. As I explain below, however, I would not give petitioners' delay in

raising the issue significant weight because respondent has made no claim to have been prejudiced by that delay. And while the burden on the opposing party of addressing a new issue is a relevant factor in determining whether to allow that issue to be raised, I am not at all convinced that the burden on the Court--due for example to the complexity of the issue or lack of precedent on point--is or should be a factor.

Although I find inadequate the majority's and Judge Thornton's explanations for their intended disposition of petitioners' cases, I nonetheless view that disposition as correct for reasons other than those offered by the majority or Judge Thornton. I will now provide those reasons.

Because petitioners' motion should be read--particularly in the light of the prior procedural history--as including a request for leave to amend their petitions under Rule 41(a), they should be granted the leave they seek if "justice so requires". See Rule 41(a). A motion for leave to amend pleadings cannot be denied without a "substantial reason". Estate of Strangi v. Commissioner, 293 F.3d 279, 281 (5th Cir. 2002) (quoting Louisiana v. Litton Mortg. Co., 50 F.3d 1298, 1303 (5th Cir. 1995)), aff'g in part, rev'g in part 115 T.C. 478 (2000). In Estate of Lee v. Commissioner, 2009 WL 4981328, at *3, we wrote: "A court should generally consider, when weighing a request to amend a pleading, whether

an excuse for the delay exists and whether the opposing party would suffer unfair surprise, disadvantage, or prejudice." We recognized, however, that, regardless of other factors, "a court should deny a party's request to amend a pleading where the party cannot prevail on the merits of the requested amendment." Id.

Petitioners have offered us no excuse for their delay in raising the issue of the creditability of the covered-over amounts against their Federal income tax liabilities. But respondent has made no claim of having been unfairly surprised, disadvantaged, or prejudiced by petitioners' delay in raising the issue. Instead, respondent claims that allowing petitioners to raise the issue would be futile because, once the covered-over amounts were transferred to the Virgin Islands, they were "no longer available to offset * * * [petitioners'] 2001 U.S. income tax liabilities."

Respondent did not claim--and cannot credibly claim--unfair prejudice on the grounds that granting petitioners leave to amend their petitions would force him to "incur the delays and costs" of substantial additional proceedings that would amount to a new trial. Cf. Vest v. Commissioner, 1995 WL 238691, at *5. In their motion for leave to amend their petitions, petitioners assured us: "No further evidence is required to allow credits for the taxes paid by Petitioners or paid on behalf of Petitioners to the United States in the computation of tax

deficiency or overpayment." When they responded to my show cause order, however, they also moved to reopen the record. They seek to introduce evidence concerning the merits of their claimed entitlement to credits for the covered-over amounts and also concerning our jurisdiction to consider that claim. The evidence petitioners would like to introduce in regard to the substantive issue would purport to establish "that the cover over of taxes from the United States to the Virgin Islands is policy-oriented, not based on the law, and has nothing to do with the merits of any particular taxpayer's residence or tax status in the Virgin Islands or the United States." Petitioners thus apparently seek to establish that the covering over to the Virgin Islands of the amounts in issue was somehow improper and, as a consequence, should not affect their ability to reduce their U.S. tax liabilities for 2001 by those amounts. In regard to the jurisdictional issue, petitioners seek to offer evidence regarding respondent's alleged receipt of information concerning their 2001 tax liabilities sufficient to be treated as Federal income tax returns under Hulett.[6]

---

[6]In several respects, petitioners have been capricious in their adoption and discarding of positions. When petitioners first sought to amend their petitions, they had reason to minimize the need for new evidence to consider the issues they sought to raise. They changed tack, however, in their response to my show cause order, following my initial denial of their motion for leave to amend. At that point, they sought to portray themselves as the victims of unfair surprise as a result

(continued...)

The evidence petitioners seek to introduce is neither necessary nor even helpful to our consideration of their claimed entitlement to credits for the covered-over amounts. As I explain below, treating petitioners as having filed 2001 Federal income tax returns by reason of information provided by the Virgin Islands Bureau of Internal Revenue (VIBIR) to the Internal Revenue Service (IRS) would not establish our jurisdiction to determine and order the credit or refund of any overpayments petitioners may have made for 2001 by reason of allowed credits for the covered-over amounts. Petitioners' efforts to raise questions about the cover-over process would also be of no avail to them. They stipulated that the covering over of the amounts in issue in their cases occurred as a result of their

---

[6](...continued)
of new issues that, they claimed, the Court and respondent had raised. They do not deserve our sympathy. Contrary to their assertions, the issues in regard to which they seek to offer additional evidence were not raised by the Court or respondent. In arguing that the covering over to the Virgin Islands of the amounts in issue denied petitioners the ability to credit those amounts under secs. 31(a)(1), 6315, and 6402(b), respondent was not raising a new issue; he was simply responding to a new issue petitioners raised. Similarly, my inquiry into the Court's jurisdiction to consider any overpayments that might result from allowing the credit petitioners seek did not involve a new issue. I simply apprised the parties of a question regarding the Court's ability to consider the new issue petitioners sought to raise. Petitioners have no complaint about unfair surprise by questions concerning the efficacy of the position they sought to advance only after our rejection in our initial Opinion of the position they had therefore consistently maintained. Nonetheless, their change of position in regard to the need for new evidence appears to have been influenced by their desire to turn the tables and present themselves as the victims of unfair surprise.

filing Virgin Islands returns in which they claimed to have been bona fide Virgin Islands residents. Even if covering over is sometimes improper, petitioners cannot claim it to have been in their cases. Thus, our consideration of the merits of petitioners' argument--should we have jurisdiction to consider it--would not depend on the evidence petitioners seek to introduce.

Because respondent has made no argument that allowing petitioners to raise the issue of the creditability of the covered-over amounts against their 2001 Federal income tax liabilities would cause him to suffer "unfair surprise, disadvantage, or prejudice", and because he has no apparent grounds for making a credible argument to that effect, justice would require allowing petitioners to raise that issue unless they "cannot prevail on the merits of the requested amendment" to their petitions. Cf. Estate of Lee v. Commissioner, 2009 WL 4981328, at *3.

Respondent bases his argument that petitioners could not prevail on the issue they seek to raise on the premise that the covering over of the amounts in issue, as a result of petitioners' voluntarily filings with the VIBIR, removed those amounts from petitioners' 2001 Federal income tax accounts. Thus, after being covered over, those amounts were "no longer available to offset their 2001 U.S. income tax liabilities." But as plausible as that claim might appear on the surface,

respondent has provided no authority that directly supports it.[7] We need not address the substantive merits of petitioners' argument, however, if we lack the jurisdiction to do so.

Our statutory jurisdiction in a case commenced by the filing of a petition in response to a notice of deficiency allows us only to redetermine the correct amount of a taxpayer's deficiencies for the years in issue and determine and require the credit or refund of any overpayments for those years resulting from payments made during a specified period. See secs. 6214(a), 6512(b). The covered-over amounts are irrelevant to the calculation of petitioners' deficiencies for 2001. See sec. 6211(b)(1).[8] That leaves the possibility that allowing credits for those

---

[7]By way of possible analogy, when the Commissioner reduces a taxpayer's overpayment to satisfy past-due child support obligations under sec. 6402(c), or to pay a taxpayer's debt to another Federal agency under sec. 6402(d), or a State income tax liability of a taxpayer under sec. 6402(e), the taxpayer has no right of recovery against the Commissioner. Sec. 6402(g). If the taxpayer claims that the amounts in question were erroneously diverted, she must proceed against the agency that received the funds from the Commissioner.

[8]Sec. 6211(b)(1) provides that estimated taxes and amounts withheld from wages do not affect the amount of a taxpayer's deficiency, as defined by sec. 6211(a). Although the covered-over amounts included overpayments from prior years carried forward to 2001, as well as estimated payments made for 2001 and amounts withheld from petitioners' wages for that year, the prior years' overpayments are treated as estimated taxes for 2001. See sec. 6402(b).

amounts resulted in overpayments that we can determine and require to be refunded to petitioners.

Section 6512(b)(3) limits our ability to determine and require the refund of overpayments. That complex provision generally imposes periods of limitation on overpayment claims similar to those that apply to other refund claims. Under section 6512(b)(3), we can order a credit or refund only of that portion of an overpayment paid within a prescribed look-back period. In the present cases, the applicable periods extend back from October 14, 2005, the date on which respondent mailed the notices of deficiency. See sec. 6512(b)(3)(B). How far back each petitioner's look-back period extends turns on whether she filed a return for the taxable year in question and, if so, whether she received any extensions of time for filing that return. See sec. 6511(b).

Petitioners stipulated that "[n]one of * * * [them] filed any federal income tax returns for the tax year 2001 with the United States' Internal Revenue Service". If petitioners' failure to file Federal returns with the IRS determines the applicable look-back periods under section 6511(b), those periods would not include the deemed payment date for the amounts for which they seek credit. If petitioners are treated as having filed no Federal income tax returns for 2001, their applicable look-back periods extend back three years to October 14, 2002. See

sec. 6512(b)(3) (flush language).  All of the payments in issue, however, were deemed to have been made on April 15, 2002, the due date (without extensions) of petitioners' 2001 Federal income tax returns.  See sec. 6512(b)(1) and (2).

Petitioners claim that, under our recent Opinion in Hulett, they should be treated as having filed returns with the Commissioner.[9]  Although the taxpayers in Hulett did not file returns with the IRS, the VIBIR transmitted to the IRS parts of the returns it had received from the taxpayers.  Judge Holmes' opinion for the Court in Hulett concluded that the information the VIBIR provided to the IRS constituted a return sufficient to commence the running of the period of limitations on assessment of any Federal income tax liabilities the taxpayers would have owed

---

[9]When petitioners first sought to amend their petitions to raise the issue of the availability of the covered-over amounts to offset their 2001 Federal income tax liabilities, they could not have been relying on Hulett v. Commissioner, 150 T.C. __ (Jan. 29, 2018), for their implicit claim that we would have jurisdiction to determine and order the refund of any resulting overpayments.  Petitioners filed their motion for leave to amend their petitions on February 21, 2017--almost a year before we issued Hulett.  Petitioners seemed not to have been aware of the jurisdictional issue.  When I discussed that issue with the parties on February 22, 2018, Hulett had recently been released.  Petitioners were then aware of that Opinion and suggested that, under the analysis therein, we would have jurisdiction to consider their overpayment claims.  They developed that argument further in their response to my show cause order.

if they had not qualified as bona fide Virgin Islands residents.[10]  Concurring in the

result only, Judge Thornton suggested that, under the particular facts presented in

that case, the returns the taxpayers filed with the VIBIR should have "sufficed to

commence the limitations period under section 6501(a) for Federal income tax

purposes."  Hulett v. Commissioner, 150 T.C. at __ (slip op. at 60) (Thornton, J.,

concurring in the result only).

Petitioners in the present cases erroneously contend that we would have

jurisdiction to consider their overpayment claims under the analysis of either

Judge Holmes' opinion for the Court in Hulett or Judge Thornton's concurring

opinion.  Were we to follow the analysis of the opinion of the Court in Hulett and

treat petitioners as having filed 2001 returns with the IRS at some point before

October 14, 2005, by reason of information that the VIBIR may have provided to

the IRS, the applicable look-back period would cover the same three-year period

that would result if we treated petitioners as having filed no Federal returns at all.

Section 6511(b)(2) provides that, when a taxpayer filed a return for the relevant

year, the look-back period is "3 years plus the period of any extension of time for

---

[10]Because we were addressing the taxpayers' motions for summary
judgment in Hulett v. Commissioner, 150 T.C. at __ (slip op. at 4), we assumed
that neither taxpayer qualified as a bona fide resident of the Virgin Islands for the
years in issue.  Id. at __ (slip op. at 3).

filing the return." Petitioners have not established that they requested or received extensions of time for the filing of Federal income tax returns for 2001, nor do they proffer any evidence to that effect in their motion to reopen the record.[11] Therefore, the applicable look-back period under section 6511(b)(2) would be limited to three years, extending back only to October 14, 2002--almost six months after the deemed date of payment of the amounts in issue.[12]

_____

[11]Contrary to Judge Thornton's claim, I make no assumption about whether petitioners did or did not receive extensions of the time for filing the 2001 Federal income tax returns they should have filed but did not. Petitioners, as the parties seeking our jurisdiction to address their claims, have the burden of establishing any facts on which that jurisdiction would rest. See, e.g., Fehrs v. Commissioner, 65 T.C. 346, 348 (1975). They have failed to meet that burden. Moreover, under the circumstances, it would be quite surprising if petitioners had in fact sought extensions to file 2001 Federal returns. Their requests for extensions of time to file 2001 Virgin Islands returns indicate that they adopted their position of having qualified as bona fide Virgin Islands residents for that year some time before April 15, 2002. If their claim of residency had been correct and they had ultimately reported all of their income on their 2001 Virgin Islands returns, they would not have been required to file Federal income tax returns for that year. They could, of course, have filed protective Federal income tax returns to allow for the possibility that their claim to Virgin Islands residency was erroneous, but they never did so. Moreover, they would have had no apparent need to request extensions of time to file protective Federal returns reporting no gross income.

[12]Petitioners apparently agree with my analysis but betray faulty arithmetic in concluding that a three-year look-back period would be adequate to include the deemed date of payment of the amounts in issue. They contend that, under Hulett, they "are deemed to have filed their returns with Respondent so that the three-year lookback rule applies." But they err in claiming that application of "the three-year lookback rule of § 6512(b)(3)(B)" means "that taxes deemed paid on April 15,

(continued...)

Similarly, adopting the analysis of the concurring opinion in <u>Hulett</u> might be of no avail to two of the three petitioners. If we treated the returns petitioners filed with the VIBIR as Federal income tax returns, the applicable look-back period under section 6511(b) would include any period by which the VIBIR extended the due date of their 2001 Virgin Islands returns. But the record does not establish that either Gail Vento or Nicole Mollison received an extension of more than four months to file her Virgin Islands return. A look-back period of three years and four months would extend back only to June 14, 2002--almost two months short of the deemed payment date of the amounts for which petitioners seek credit.

By contrast, the record does establish that petitioner Renee Vento received extensions totaling six months to file her 2001 Virgin Islands return. Therefore, at least in her case, treating her Virgin Islands return as the relevant return for determining the applicable look-back period would result in a period that would extend back to April 14, 2002. Because Gail Vento and Nicole Mollison each filed her Virgin Islands return on October 15, 2002, we might infer that each of them, too, received extensions totaling six months.

---

[12](...continued)
2002 * * * may be considered for credit or refund under § 6512(b)(1)." By my calculation, April 15, 2002, preceded the date of issuance of the notices of deficiency (October 14, 2005) by more than three years.

Therefore, I believe that determining whether justice requires allowing petitioners to raise the issue of their ability to apply the covered-over amounts to offset their 2001 Federal income tax liabilities requires the Court to decide whether to adopt the analysis of the concurring opinion in <u>Hulett</u>. Unless we adopt that analysis, we do not have jurisdiction to consider the overpayment claims of any of petitioners. But choosing to adopt that analysis would mean we <u>do</u> have jurisdiction to consider at least Renee Vento's claimed overpayment. If we are unable to uphold my prior denial of petitioners' motion for leave to amend their petitions on the grounds that, by reason of our lack of jurisdiction to consider the issue they seek to raise, the proposed amendments would be futile, then we would be required to go on to consider their overpayment claims on the merits. I understand my colleagues' desire to avoid a jurisdictional question that recently split the Court and a substantive question on which little or no authority may exist. But much as we might wish to avoid those issues, I believe addressing them is necessary to determine whether, under Rule 41 and our prior precedents, justice requires allowing petitioners to raise the issue of the availability of the covered-over amounts as offsets to their 2001 Federal income tax liabilities.

I would decline to adopt the analysis of the concurring opinion in <u>Hulett</u> because, for the reasons explained below, it would effect an unwarranted

extension of our holding in Appleton v. Commissioner, 140 T.C. 273 (2013). I start with the proposition that a taxpayer's entitlement to the benefit of the statute of limitations on assessment requires "meticulous compliance" with the conditions specified for the filing of the taxpayer's return. Lucas v. Pilliod Lumber Co., 281 U.S. 245, 249 (1930).[13] And, as we wrote in Winnett v. Commissioner, 96 T.C. 802, 808 (1991), "[t]o 'meticulously comply' with the conditions for commencing the running of the statute of limitations, a taxpayer must file his return where section 6091 or the regulations promulgated thereunder require the return to be filed."

The directives provided under section 6091 on where a taxpayer must file his return proved to be critical to the result in Appleton. That case involved a taxpayer whom the parties stipulated to have been a bona fide Virgin Islands resident for the years in issue. For those years, the taxpayer (like the taxpayers in Hulett and those before us) filed returns with the VIBIR but filed no returns with

---

[13]Because we apply a uniform definition of "return" for all purposes under the Code, precedents that address when the filing of a return commences the period of limitations on assessment are also relevant to determining the applicable look-back period under secs. 6512(b)(3) and 6511(b)(2) (which also turns in part on when the taxpayer filed her return for the year in issue). As we explained in So. Sportswear Co. v. Commissioner, 10 T.C. 402, 405 (1948), vacated and remanded per stipulation, 175 F.2d 779 (6th Cir. 1949), "[e]ndless confusion would result if returns were to be treated as valid for some purposes and invalid for others, according to the purpose of the particular statute involved."

the IRS. The Commissioner claimed that the taxpayer owed U.S. tax liabilities despite his stipulated qualification as a bona fide resident because he failed to meet the conditions specified in section 932(c)(4).[14] The taxpayer moved for summary judgment on the grounds that the Commissioner's attempt to assess Federal tax for the years in issue was barred by the statute of limitations. In particular, the taxpayer claimed the return he filed with the VIBIR for each year commenced the running of the period of limitations on the assessment of Federal tax liability for the year. Because we addressed the taxpayer's motion for summary judgment, we assumed that he had not met all of the conditions specified in section 932(c)(4) and thus had "fallen back into the Federal reporting and payment system." Appleton v. Commissioner, 140 T.C. at 282. We thus considered whether the taxpayer's filing of Virgin Islands returns commenced the period of limitations on assessing Federal tax as well as Virgin Islands tax.

Our resolution of the issue before us in Appleton turned on "whether the VIBIR was the correct revenue office designated by the Secretary and the IRS to receive * * * [the taxpayer's] returns." Id. at 286-287. The regulations then in

---

[14]U.S. citizens or residents who qualify as bona fide residents of the Virgin Islands are generally exempt from U.S. tax. To qualify for the exemption, however, sec. 932(c)(4) requires the taxpayer to file a return with the Virgin Islands reporting all of her income and to fully pay the tax due to the Virgin Islands.

effect (which predated 2001) required residents of a U.S. possession to file their returns where the return forms or their instructions designated. Sec. 1.6091-3(c), Income Tax Regs. And the instructions in the Form 1040, U.S. Individual Income Tax Return, for each of the relevant years included an explicit directive that "permanent residents" of the Virgin Islands file that form with the VIBIR. (The parties had stipulated that the phrases "permanent resident" and "bona fide resident" were synonymous.) Thus, we concluded not only that the Forms 1040 the taxpayer filed were the right returns but also that he had filed them in the right place. On the basis of the directive included in the form instructions regarding the proper filing location, we concluded that the taxpayer's filing of a return with the VIBIR for each of the years in issue commenced the running of the period of limitations on assessment for that year and, consequently, the Commissioner's attempt to assess Federal tax was time barred.

The analysis of the concurring opinion in Hulett would extend Appleton's treatment of a return filed with the VIBIR as the required return from a taxpayer for Federal income tax purposes to a case in which the taxpayer's claim to bona fide Virgin Islands residence either is or may be unfounded. (By contrast, the requirement that the taxpayer in Appleton file a Federal income tax return arose not from the invalidity of his claim to bona fide Virgin Islands residence but

instead from his assumed failure to comply fully with the conditions of section 932(c)(4).)

Given the importance of the proper place of filing in <u>Appleton</u>, such an extension of the holding in that case is unwarranted. The assumed noncompliance of the taxpayer in <u>Appleton</u> with the conditions specified in section 932(c)(4) did not affect the place at which he was required to file any income tax returns due under Federal law. Our acceptance that the taxpayer in <u>Appleton</u> qualified as a permanent resident of the Virgin Islands, and thus as a bona fide resident of that possession, meant that the taxpayer was required to file his returns with the VIBIR. By contrast, the invalidity of a taxpayer's claim to bona fide Virgin Islands residence would affect where she would be required to file her Federal income tax return. The directions in the instructions to Form 1040 on which we relied in <u>Appleton</u> applied to "permanent residents of the Virgin Islands", <u>see</u> <u>Appleton v. Commissioner</u>, 140 T.C. at 283, not to those who merely claim to be Virgin Islands residents. Petitioners in the present cases have brought to our attention no authority that directed them to file their required Federal income tax returns with the VIBIR simply because they initially took the erroneous position that they qualified as bona fide Virgin Islands residents.

Contrary to Judge Thornton, I do not see how any absence of instructions available to petitioners on where to file their 2001 returns weighs in favor of treating the return each filed with the VIBIR as the return she should have filed with the appropriate IRS service center for her State of residence. Had petitioners qualified as bona fide Virgin Islands residents, section 932(c)(2) would have directed them to file returns with the VIBIR. If they had also met the conditions specified in section 932(c)(4), they would have had no obligation to file Federal returns. And, under Appleton, even if they had failed to meet the conditions of section 932(c)(4), the returns they filed with the VIBIR would also have satisfied their Federal filing requirement. But petitioners were not bona fide Virgin Islands residents for 2001. Consequently, they should have filed their returns for that year with the IRS. Petitioners were thus not lacking in instructions on where to file their returns. But the appropriate place of filing turned on their residence. The only question on which specific guidance was lacking in 2002, when their 2001 returns were due, was how, if at all, a taxpayer who claims to be a Virgin Islands resident can start the period of limitations running in the event that claim turns out to be erroneous. But the answer to that question is hardly mysterious. Making protective filings that would be unnecessary under a taxpayer's primary position is

quite common. Taxpayers do not need detailed guidance from the IRS to figure out how to protect themselves.

Judge Thornton would characterize petitioners' 2001 returns as "section 932(c)(2) returns" and interpret that section as having directed petitioners to file their returns with the Virgin Islands. He misreads section 932(c)(2). That section requires each individual to whom section 932(c) applies to file a return with the Virgin Islands. And section 932(c) applies to individuals who are bona fide Virgin Islands residents and those who file a joint return with a bona fide Virgin Islands resident. Thus, the applicability of section 932(c) turns on actual residence, not an erroneous claim to residence.[15]

---

[15]In alleging that my analysis "harbors an internal inconsistency", Judge Thornton betrays a misunderstanding of its scope. See Thornton op. p. 27. He asserts: "If application of section 6501 depends on whether the taxpayer was in fact a bona fide resident, rather than on whether he or she filed as such, then section 7654 should be interpreted in exactly the same way, i.e., as requiring actual residency rather than just a VIBIR return reporting residency." See id. p. 28. There may be good reason, however, to apply sec. 6501 on the basis of actual residence and to apply sec. 7654 on the basis of claimed residence: Requiring the Virgin Islands to wait for funds until claims of Virgin Islands residence have been finally determined would seriously hinder its collection of the revenue necessary to run its Government. But there is a more basic reason why Judge Thornton has not caught me out in "an internal inconsistency": By concluding that we lack jurisdiction to consider petitioners' overpayment claims, I avoid the need to address the substantive merits of those claims. Thus, I have no need to consider whether the covering over of the amounts in issue complied with sec. 7654. In his attempt to trip me, Judge Thornton in effect says: "The basis on which Judge

(continued...)

The filing of a return in the prescribed location is important to enable it to fulfill the purpose of facilitating the Commissioner's administration of our self-assessment tax system.  For that reason, imperfect returns filed in the right place can commence the period of limitations on assessment, but returns filed in the wrong place--regardless of their accuracy--cannot.  In Reiff v. Commissioner, 77 T.C. 1169, 1177 (1981), we acknowledged that "[a] return need not be perfectly accurate or complete if it purports to be a return, is sworn to as such, and evinces an honest and genuine endeavor to satisfy the requirements for a return."  In the very next sentence, we added:  "To qualify, however, a return must contain sufficient data from which respondent can compute and assess the liability with respect to a particular tax of a taxpayer."  Id.  A return cannot be properly processed, allowing the Commissioner to record a taxpayer's self-assessed liability, until it is received by the office designated to accept it.  See Helvering v. Campbell, 139 F.2d 865, 868 (4th Cir. 1944) ("[T]he filing of returns with the Philippine Collector under the Philippine income tax law * * * did not apprise the proper tax official of the United States of the liability of taxpayers for the federal

---

[15](...continued)
Halpern determines that we don't have jurisdiction to consider petitioners' substantive argument is inconsistent with his treatment of the substantive issue he thereby avoids."

income tax imposed upon them."); see also W.H. Hill Co. v. Commissioner, 64

F.2d 506, 507 (6th Cir. 1933) (noting the importance of filing a return with the

appropriate official to ensure "the prompt and orderly assessment and collection of

taxes"), aff'g 23 B.T.A. 605 (1931) and 22 B.T.A. 1351 (1931).  Similarly, a

return filed with the VIBIR does not allow the Commissioner to record a

taxpayer's self-assessed liability to the IRS (which may be zero) unless the VIBIR

provides the IRS with sufficient information to accomplish that task.[16]

---

[16]Judge Thornton's concurring opinion in Hulett relies on our own and Supreme Court precedents involving returns that, although indisputably or allegedly defective, were nonetheless sufficient to commence the period of limitations on assessment.  See Germantown Tr. Co. v. Commissioner, 309 U.S. 304 (1940); Mabel Elevator Co. v. Commissioner, 2 B.T.A. 517 (1925); New Capital Fire, Inc. v. Commissioner, T.C. Memo. 2017-177.  In his concurring opinion in the present cases, Judge Thornton again invokes those cases "for the proposition that a taxpayer's error regarding her status falls within the protection of the statute of limitations."  Thornton op. p. 26.  Even accepting for the sake of argument that Germantown Tr. Co., Mabel Elevator, and New Capital Fire establish that a taxpayer need not file a protective return when the return the taxpayer "actually filed discloses enough information for the IRS to flag the relevant issues", see Hulett v. Commissioner, 150 T.C. at __ (slip op. at 67) (Thornton, J., concurring in result only) (emphasis added), that principle does not apply to a return filed with the VIBIR by a taxpayer who erroneously claims to be a bona fide Virgin Islands resident.  A return filed with the VIBIR does not enable the IRS to flag relevant issues unless the VIBIR happens to pass along to its Federal counterpart some or all of the information provided in the return.  The opinions in Germantown Tr. Co., Mabel Elevator, and New Colonial Fire provide no indication that the returns at issue in those cases were filed in the wrong place.  And for the reasons explained above, cases of "wrong return, right place" are meaningfully distinguishable from those involving the right type of return filed in

(continued...)

Because petitioners were not bona fide residents of the Virgin Islands for their 2001 taxable years, they could not rely on the instructions to Form 1040 to file their 2001 returns with the VIBIR. Petitioners have brought to our attention no other authority identifying the VIBIR as the agency designated to receive their 2001 Forms 1040. Consequently, I conclude that the returns they filed with the VIBIR were not "properly filed" as Federal income tax returns. Cf. Appleton v. Commissioner, 140 T.C. at 284. Because petitioners have not established that, in filing returns only with the VIBIR for 2001, they "meticulously complied" with their return filing obligations, the filing of their Virgin Islands returns did not commence the period of limitations on the assessment of their Federal income tax liabilities for that year. And, because we apply a uniform definition of "return", the 2001 returns petitioners filed with the Virgin Islands cannot qualify as the relevant returns for the purpose of determining the applicable look-back periods under sections 6512(b)(3) and 6511(b)(2).

Because the record provides no evidence that petitioners requested and received extensions of time to file the Federal income tax returns they were required to file for 2001, the applicable look-back period under sections

---

[16](...continued)
the wrong place.

6512(b)(3) and 6511(b)(2) for determining the extent of our ancillary overpayment jurisdiction in the present cases is three years--regardless of whether the IRS, at some time before October 14, 2005, received sufficient information from the VIBIR to constitute returns under the analysis of the Court's opinion in Hulett. The applicable look-back period thus extends only to October 14, 2002--almost six months after the April 15, 2002, deemed date of payment of the amounts for which petitioners seek credit. We therefore lack jurisdiction to determine and order the credit or refund of any overpayments in petitioners' 2001 Federal income taxes that may have resulted from their estimated payments for that year, withholdings from wages paid during that year, and overpayments from prior years carried forward to that year.

In sum, the covered-over amounts do not reduce petitioners' deficiencies (as defined by section 6211(a)); and, unless the Court adopts the analysis of the concurring opinion in Hulett, it does not have jurisdiction to determine and order the refund of any overpayments that would result from allowing petitioners to apply those amounts against their 2001 Federal income tax liabilities. Thus, I conclude that the amendments petitioners sought to make to their petitions would be futile and it is appropriate to uphold my prior denial of their motion for leave to amend their petitions, even though I based that denial on a concession that

petitioners later disavowed. It follows that petitioners' motion to reopen the record should also be denied, my show cause order should be made absolute, and decisions should be entered in accordance with respondent's Rule 155 computations. Although petitioners are entitled to a better explanation for that result than the majority and Judge Thornton provide in their brief opinions, I recognize that petitioners might not find my more involved explanation much more satisfying: It may be little consolation to learn that, had we not pulled the football away, their kick would have fallen short of the goalposts.

MORRISON, J., agrees with this concurring opinion.